Case No. 15-3040 et al., United States of America v. Noe Machado-Erazo, also known as Gallo, also known as Noel Machado-Erazo, appellate. Good morning. Good morning. May it please the Court, I'm Kira Ann West, and along with my esteemed colleague, Mr. Thomas Corcoran, Jr., we represent Mr. Noe Machado-Erazo. I will be arguing the cell tower evidence argument. The district judge abused his discretion by allowing the government's experts to testify to a specific range of coverage. This was exasperated, exacerbated by the alteration of exhibits. Under Daubert and Humotier, the district judge must act as a gatekeeper and may allow the introduction of an expert's opinion of a scientific or technical nature only if it rests upon a reliable methodology. Judge Lambert dared, when he allowed Agent Magnuson to opine over a timely and cogent objection, that he knew after reviewing cell tower data that specific cell phones were within certain distances of a fixed object or to another cellular phone. The agent did not and could not base that conclusion on any reliable methodology. Indeed, during a limiting motion argument before the trial judge, pretrial judge, Judge Collier, and after we gave her notice that Magnuson's report didn't contain the methodology necessary to support scientific range estimates, the government admitted that their expert could not opine as to specific cell phone locations and would only testify about the tower to which the phone connected while in a broad sector of uncertain range. What was the precise testimony given about ranges and distances that you believe was erroneous? This precise testimony, Your Honor, was that it would be a general location of where the, quote-unquote, general location of where the cell tower would be. And that's what Judge Collier based her decision on, pretrial, in large part. I understand that part. You're saying that it was error for him to have testified about a specific range. I'm asking you to tell me exactly what evidence regarding a specific range or distance was given. I didn't think I understood your question initially. He said within, exactly, quote-unquote, within one-half mile, which our argument is that that is a specific distance that he should not have testified under Daubert or... Within one-half, that two phones were within one-half mile of each other? Yes, sir. And what that signifies for Tenz is that that testimony was really giving a two circles where those phones intersected within a half a mile of each other, which is exactly what the government said he would not testify to. On cross-examination, didn't he essentially walk back that testimony? I can't say that he walked it back, but he did say it could be one mile, two miles, and then the most interesting thing he said was it could be up to 12 miles. And if the court would consider the sector is a 120 degree, generally, angle like this, and if you say 12 miles where that phone could be, that could be from here to, say, probably as far as Manassas. So how is the testimony prejudicial if he said at one point within a half mile, and then one to two miles, and then 12 miles, and wouldn't the jury just come away with that, saying that he has no idea? That's not how the testimony came out. The testimony on cross-examination is exactly as you just described, but then he then later testified that it would be within a half a mile. And that's what we say is prejudicial. And when you put that along with a government's Exhibit 306, the mapping, and then the testimony of whose number belongs to whom, that's where we say the prejudice lies. And there was – I know where the court's going. There is a Seventh Circuit case, United States v. Hill, where the court said, well, this is what the person testified to, the agent. However, he saved himself, and that's the language the court used. He saved himself by saying, well, it could have been a range farther out than that. He didn't give a specific range, and so he acknowledged that that was the case. We don't have that type of – our contention is we don't have that type of acknowledgment. Because the government's evidentiary case against Mr. Machado was thin at best, the crux of the case against him turned out where his phone was at a certain time on a certain date. And therefore, any expert testimony in this regard should have been limited to the judge's pretrial ruling. Can I ask – it seems like there are at least a handful of cases recognizing the reliability of this kind of expert testimony. Yes, Your Honor. Jones and Davis – or Davis is one with this particular witness. Yes, Your Honor. So your concern, as I understand it, is not with the general methodology of trying to figure out where a phone is by figuring out which cell towers it does or doesn't connect to. That's correct. Your quarrel is with the half mile. Right, which is what we say is a specific location. Why couldn't – I mean, is half a mile specific or general? I mean, who knows? The best case you have is one in which a court said it was unreliable to use this technology to place a phone within a particular building. This is not that. This is half a mile. One could think of that as general rather than specific within a range, which is what the government said they would do. And I understand that the court is talking about the Evans case in Illinois. Right. But the difference there is – and you're right. Judge Huvel and Jones and Judge Collier relied a great deal in her Machado opinion on what Judge Huvel said in the Jones case. And the great thing about the Jones case that distinguishes it from this case is that Judge Huvel said, I think the jury can be confused by the way your map is drawn with that arc over the sector. Because that puts – and this is where I get what's the definition of general. Right. You put that arc over there, that's your – then you have a mathematical figure of a general – of an area. You have the point where the cell tower is. Correct. And you have the angle reflecting – I forget what it's called – the sector. Yes, sir. And you have the vector, the arrow, sort of pointing towards that direction. Yes, sir. And it seems like anyone looking at that would understand the vector doesn't go on forever, right? It's not 1,000 miles or 100 miles, right? Well, it could, but we don't have the methodology to show that in this case, which is part of our problem. And that was the problem in Jones, is that if you put that arc on there, then the agent's allowed to testify within that space, and that would then not be a general location, which is why Judge Huvel said take that arc out of there and – So my understanding is in a remote area, the vector could go on, say, for 10 miles, right, if there are no other cell towers. So would you be making the same argument if – same disclosures, and then the witness gets up and says, well, I think it's within 10 miles? Well, I would, and here's why. So the government can't put – it's not the point that half a mile is too precise. It's the point that they can't quantify the size of that vector at all? It's both. It is that half a mile is too precise, because that clearly would be within that vector with an arc on the end. And the agent in this case, he didn't do the JDSU software. He didn't walk through. He didn't get any information from the cell tower companies as to what cell tower was working. So we have a map that has a bunch of cell towers on it, but we don't know which one was functioning and which one wasn't. We don't know the radio frequencies of those towers. There's all kinds of methodology that's missing in this case, and that's one of our arguments is why we believe he should not have been able to testify within a half a mile. Besides the fact that he gave that – they told us pre-trial, we're not going to do any specific, and told Judge Collier that. Then when it came to trial, they told Judge Lambert that they handed the two pages they gave us mid-trial. I think we'd been in trial 10, 11 days, and it said one to two miles. And they said, well, Judge Collier's already ruled on that, which clearly she hadn't. She hadn't seen those two pages that said one to two miles. So that's where I get – or we get the specific location, even one to two miles would be a specific location. So let me ask you, how critical was this witness to the government's case against your client? It had cell phone records. It had other witnesses to testify. This witness was the most critical witness. Why? Because the two MS-13 members who were informants or cooperating co-defendants, Solorzano and Saravia, they were both impeached, heavily impeached. Saravia was impeached because he testified that our client committed the murder and that he called three times right during the time he committed the murder. But the cell phone records show they never talked. What about the transcripts of the telephone call? There was nothing in the transcripts of the telephone call to talk about my client with regard to the murder at all. That's why this became so important and why we believe the government changed gears mid-trial because Solorzano was impeached on the phone numbers who belonged to who. Saravia was impeached on having called him that night. So this was it. This was the only thing that the jury could believe, and I believe it was critical, and there's evidence of that because the jury was out for 11 days. And I'm sure that they were struggling with, and why we say the alteration of the exhibit is so important, is because they didn't know, the jury couldn't keep track of how many numbers Machado had. So is your position then that let's assume there was a violation of Rule 16, let's assume that the supplemental submission was untimely, let's assume that your pretrial motion not only alerted the district court to the problem, why isn't the error harmless even though you say this was the government's critical witness, given that the government gives you credit for extraordinary cross-examination, extraordinarily effective cross-examination, and, of course, closing arguments? I think it can't be harmless error, Your Honor, because the jury by this time was so confused as to what a sector could be distance-wise, how many phones Mr. Machado had, and it's not harmless error because I think I'd understand the court's question if the prosecutor had not, in closing statements, said, Mr. Machado used more than one phone, he had several phones. And that was the critical issue in this Exhibit 306 is what phone belonged to whom, and the agent couldn't testify to that, but the records could show that, and Salorzo and Sarabia could also testify to that. So we believe that the confusion was so great that it's not harmless error. And I see that my time has expired. All right. Thank you. We'll hear from the government on this issue? I'm sorry, Your Honor? We will hear from the government on this issue. Good morning. Good morning. May it please the Court, Elizabeth Gabriel on behalf of the United States. The district court did not abuse its discretion in admitting Agent Magnuson's testimony. His testimony remains general throughout. Could I ask you where in the record will I find the summary provided under Rule 16A1G that describes the witness's opinion, the basis and reason for those opinions? Your Honor, what was provided in our expert notice was the 36 to 38 page report that Agent Magnuson had produced plotting the cell towers. So is that the various maps? The maps. Yes, Your Honor. I looked at all those maps, and I looked at the little paragraph that preceded them. I don't see anything that tells me what the witness's opinion is or the basis or reasons for those opinions in that pre-trial Rule 16 submission by the government. Is there something I have not seen in the record? No, Your Honor. What you described is what the government provided. So is the government's position that in submitting those pages it complies with Rule 16A1G? Well, Your Honor, I think it did in that it graphically represented what Agent Magnuson's testimony would be. How? How? How? It shows me a map with some dots on it, an arrow. Well, it showed the cell towers that were used, the sectors that were used. But what is your expert going to say about those dots, cell towers, and maps? He said exactly what his maps depicted, which is that a phone used a particular tower and a sector at a particular time. What I'm trying to understand is if I am defense counsel and I'm trying to understand what the government's expert is going to testify, and I file a pre-trial discovery letter that asks specifically for what the rule requires the government to submit, and then I file a pre-trial motion saying the government has not submitted this information, how am I supposed to prepare for trial? Well, Your Honor, I don't think there was that sort of confusion here. The appellants in their motion in Lemonnier clearly knew what Agent Magnuson's theory was. In fact, they described it. Actually, in their motion, they said they didn't know. That's what I'm trying to understand. In terms of what Rule 16 sub G says is the required statement or the required summary. Well, I don't think that their argument wasn't that they didn't know. Looking at these maps, they had no idea what his testimony would be. Their argument was that his testimony was unreliable because there was no way to tell from, you know, cell towers that were used where a particular phone is located. Because they don't know the opinions and the basis and reason what he's going to say. That's all sides of what they were objecting to. Isn't that correct? I just want to be clear about whether the government thinks its submission complied with the rule. I think the submission could have been more fulsome. Yes, Your Honor. I'm not going to suggest that the submission. So, mid-trial, defense counsel first learned that, in fact, the witness is going to talk about locations within one to two miles. Yes, Your Honor. But, well, that was not the first that they knew that that was his methodology because they, in fact, attached his testimony from a prior case in which he gave the exact same testimony. There wasn't a surprise to them. I'm struck by the fact that because a witness has been qualified in another case, therefore the witness is automatically qualified as an expert in the case now before the district court. But I don't think that that was the district court's conclusion. Well, the district court relied on Judge Huvel's description of methodology where, at least according to the published opinion, what the witness was going to say was quite different. Well, the methodology used in that prior case was essentially the same as the methodology used here. How did the district court know that? Well, because she had the maps and she saw the way that he had plotted the projected coverage areas. But did the district court have a statement of his opinions and the basis and reasons? Apart from his map, no. But these were, again, graphic representations of what he had concluded. There's nothing in the disclosure that gives any sense of order of magnitude, right? Ten miles is very different from half a mile. No, but Magnuson's testimony was general throughout. In the one instance where he actually put a number on the distance, that half a mile statement, it still was a fairly general estimate. I understand. I'm not pressing right now on whether half a mile is in some sense general or specific. I'm pressing on the absence of any magnitude of, are we talking about ten miles or one to ten miles, which is what people think is the case in rural areas, one to two miles, which is what he said in the Jenks statement, or half a mile, which was his ultimate opinion at trial. Right. I mean, in our initial disclosure, that was not included. But in the prior testimony attached by appellants to their motion to eliminate, he gave those kind of numerical projections. So in the Florida case with Judge Rosenbaum, what was the order of magnitude, one to two miles, half a mile? That was the Davis case. I don't think, I'm not entirely sure if he gave an order of magnitude, but the case that was attached to appellant's motion was the Savage case out of Pennsylvania. And there he did testify that generally cell towers in urban locations tend to have a range of one to two miles. They can be greater in rural areas. And that was entirely consistent with his testimony here. And, again, I think Magnuson at trial was very careful to emphasize to the jury that he wasn't able to determine exactly where a phone was. But this prior testimony was given not with the Rule 16 notice. It was given as Jenks, right? The two-page document, or the prior testimony was attached to appellant's motion to eliminate. So they brought it to the court's attention. And that was a month before trial. Yeah, but that was not as part of the government's Rule 16 notice. No, it was not. No, it was not. But I don't think that – But, I mean, you're turning Rule 16 on its head. You're saying that the defense is supposed to be able to figure out that he's likely to give these opinions in this case because he gave similar opinions in the prior case, where it's the government's burden or obligation to explain what the opinions are that its expert is going to give in this case. Your Honor, I'm not suggesting that. What I'm trying to suggest is that appellants here weren't surprised by the testimony. They knew in advance what the testimony was going to be, the nature of the testimony. So in terms of, you know, in terms of prejudice – Why do they know that he's going to say the same thing in this case than what he said in Florida or somewhere else, given that Judge Uvell, on which I guess the district court based its ruling, precluded precisely that sort of testimony, right? Well, she precluded testimony as to exact location, and that had never been the nature of his testimony in any prior case. Was the nature of his testimony in this case the same as the nature of the testimony in the Jones case? Yes, Your Honor, it was. It was general location within a sector as depicted in the maps. So appellants knew what his testimony was going to be. Their complaint on appeal is not, as Judge Katz has pointed out, not that his testimony is entirely unreliable and inadmissible, but simply that that discrete testimony about the half-mile range of the tower is inadmissible. And our argument is that it's still within this general range. A half a mile is – But if they had talked to an expert before trial who said that it's absolutely ridiculous if he were to come in and say it's within a half-mile, a mile, or two miles, but they hadn't, you know, didn't have that expert at the ready because they didn't believe that the expert, your expert, was actually going to do that, and then they can't get their expert in time because he or she has other obligations, et cetera, because this is prolonged and mid-trial. I mean, that's why you have Rule 16. But there's nothing in the record to suggest that their expert wasn't available or couldn't testify. They had noticed the expert pretrial. At the conclusion of the evidence, they told the court that they weren't planning to call their expert. They never suggested to the court that our expert isn't available or for some reason we were prejudiced and can't put on our expert. I think the fact that they didn't put on an expert is strong evidence that they didn't, in fact, find the testimony prejudicial. And, again, all of this was played out before the jury in cross-examination and closing argument, and contrary to appellant's contention, there actually was very strong evidence of appellant's guilt apart from the cell site evidence. And that is? There were three different co-conspirators. So they were all impeached. Well, there were recorded calls, Machado Arraso and Martina Zamaya. That's what I asked counsel about and I didn't ask you about because counsel represented that her client was not on those recorded calls. And that's simply incorrect, Your Honor. In a call from March 7th, the day after the March 6th meeting, which gave rise to the motive for the murder, Rivera Luna, the gang leader in El Salvador, is speaking to Machado Arraso on the phone, and he mentions that Machado Arraso gave him Enriquez's phone number so that he could investigate him. In addition, that same day, Solorzano spoke with Martina Zamaya on the phone and told him what had happened at the meeting. Martina Zamaya asked for Enriquez's phone number and agreed to help Solorzano out with his obligation to kill within 13 days. Now, I didn't hear any reference to counsel West's client in that list except the initial call. Well, he was at the March 6th meeting, and he can be heard in that recording at the March 6th meeting talking to Enriquez and basically putting him in his place, telling him how to behave. And then the very next day, he's giving – Well, how did he tell him how to behave? I'm sorry? How did he tell him how to behave? What did he say? Well, his obligations within the gang to kill, to support the gang. When Enriquez is heard criticizing – What I'm trying to focus you on is this particular murder that was heard, apparently, or at least the body was found within this one to two-mile area. Well, Your Honor, not only is he at the meeting, as I said, he's the very next day giving the phone number of the victim to the gang leader in El Salvador. And I would note that Saravia, although appellant claims he was impeached at trial, there is a recording three weeks after the murder of Saravia telling another gang member that Machado Arrazo and Martina Zamaya and him had committed the murder. And that was before he began cooperating in this case. All right. So that is Machado confessing to the murder three weeks after the meeting. Is that right? No, that was Saravia speaking to another gang member, Avila Melendez, in a recording about what had happened. So Saravia had recounted the murder. Somebody else pinned her client for the murder. I'm just trying to be very clear about this. You said there's very strong evidence. Three co-conspirators plus these recordings, March 7th, then three weeks after the murder. What else is there? Well, Avila Melendez testified that Martina Zamaya told him that the murder had been committed shortly after it was committed. These are co-conspirators. These are co-conspirators, but they're mutually corroborating. I understand, but they're impeached. You said there's very strong evidence, so I just wanted to understand what it is. You say the three co-conspirators testimony plus these two recordings you've mentioned. Yes, Your Honor. Is there anything else? Well, the recording of Saravia, which we think was before any possible motive to fabricate. Those are the two recordings I just mentioned. Anything else? That's the third recording. I'm sorry, Your Honor. The third recording. Yes. Do you have a date for that? That was April 18th. Okay. So those three recordings, and that's it? Well, and not to mention the – Anything else? I just want to know what it is. Sure. We submit that that was strong evidence, not to mention the evidence of motive and the evidence of the gang's M.O. essentially operating to eliminate recalcitrant gang members, to execute Green Light. We think that all of that was strongly supported appellate skills in this case. All right. So it's the three co-conspirators, the three recorded phone calls, and the overarching conspiracy. Yes, Your Honor. And I did want to clear up one inaccuracy before I leave the podium, and that is that Ms. West pointed out that the testimony was that the phones were within half a mile of each other. The half-mile testimony was actually that Saravia's phone was within half a mile of the cell tower. With respect to the relation of phones to each other, he used very general length talking in approximations. They were in close proximity. Very close. Very close. They were in close proximity. But, again, it's all – Those are his words. I'm sorry, Your Honor? Those are his words. Those are his words, yes. Very close. Absolutely. All right. Okay. Let me ask you – we were just conferring here about how we're going to proceed. We think we'd like to do it, if it's all right with you gentlemen, issue by issue. Okay. So shall we just have a minute of rebuttal here on the cell tower? All right. Let's see what the paper is. Okay. With regard to the Rule 16 violation, I wanted to point the Court's attention to one of the cases in the brief, United States v. Day, a district court opinion by Judge Friedman, where he quotes the advisory committee amendment of 1993, which says, requesting parties to be provided with a summary of the basis of the expert's opinion that should cover not only written and oral reports, test reports, and investigations, but any information that might be recognized as a legitimate basis for an opinion under federal rule of evidence at the time, 703, including opinions of other experts. In that case, Judge Day did not allow the expert opinion. With regard to Judge Kessler's question with United States v. Davis, which is the Florida case, the agent from my cursory review of the case right now, it appears that he did not use a specific – 50 to 70 percent of the way to the nearest cell tower as a, quote, very, very accurate depiction of the sector. And in that case, he used a different methodology than in this case. But that would imply a distance, right? Yes. 50 percent to the next tower. Right. But without knowing what those distances are, we could never know what that distance is. And he used a methodology that's different in the instant case. He used other software to come up with that. But it's not – I mean, it's a little bit of an overstatement to say that in the other case there was no attempt to quantify. In which other case? In Davis. He's saying 50 percent of the way to the other cell tower as opposed to one to two miles or half a mile. Right. Which is one of our contentions is that we don't even know how far away these cell towers are. And Agent Magnuson testified in this case he'd never been to Rockville. He was not familiar with the area. And that's another reason why we believe that the judge erred in letting his testimony. Can we talk for a second about 16D2, which is the remedy provision? Which says that the district court has a lot of discretion to figure out what to do about any violation. And it's abuse of discretion review. And we've said that exclusion is an extreme sanction that is only rarely justified. I think – and I think the other – there's a couple other remedies the court – you can grant a continuance if one is asked for. And I think in this case the problem is the government's conduct in saying this is what the testimony is going to be. And we even forewarned them with our own investigation of what his testimony was in other cases. And we objected at that time strenuously, as the record indicates. And we believe that the evidence was so thin and the confusion so great as to all the phone numbers with the exchange of the exhibit page. This is correct. This isn't correct. Okay, you see it now that I'm taking it away from you because the government didn't change it right. Okay, now I'm going to give it back to you. No, that's really the number that I'm getting. Why? There are so many different people with so many different phone numbers it was impossible to keep straight. Why couldn't the district court, given this broad discretion as the remedy, say to himself, the technology is generally reliable. It's pretty clear from this disclosure sort of how the expert is going to proceed. You know the point and you know the sector. The real harm to you is you don't know the quantum, whether the opinion is ten miles or one mile or half a mile. But you do know generally that the closer you try to pinpoint the cell phone, the less reliable the testimony is going to be. And that gives you enough ammunition to cross-examine an expert when he comes in and says, no, this is not the ten-mile case. This is the half-mile case. Which is what we can – and Judge Wilkins asked earlier what that testimony was. It was on direct examination where he said, well, it could be up to 12 miles. Then we do our cross-examination. And then he, I believe, on redirect says that it could be within a half a mile without the transcript. I can't swear to that. But that is our – that is the problem is we didn't have – we couldn't – once the cat's out of the bag, you could bring in your expert and, yeah, you couldn't say that. That becomes something we couldn't overcome. You – as I understand it, you had a cell tower expert who was ready to go and chose not to put him on the stand. That's not true. We did have a – we did notice an expert. But after Judge Collier made her ruling, there was no harm to us if somebody is going to testify within the sector because we know from our experts that sector could be within ten miles. So there wasn't really any harm to us. The harm occurred when we start talking about specific distances. Finally – But you didn't ask for any remedy or relief other than exclusion of that testimony. That's correct. And the judge overruled our objection at that time, actually several times, and there was no instruction given. Well, he did instruct, did he not, that the jury was not required to accept the expert's testimony. Yes, that's in the jury instructions, Your Honor. Finally, I wanted to make clear for Judge Rogers specifically that my client was indeed on several wiretap phone calls. We believed in the defense team that his language on those calls did not indicate that he was going to commit a murder. It's a very different thing being a member of MS-13 involuntarily, I might add, and doing things. There's quite another matter being some other cooperating codifier saying you committed a murder. That's our point. All right, thank you. Thank you, Your Honor. All right, we'll turn to Issue 2. May it please the Court, my name is Christine Pembroke. I represent Mr. Martinez Amaya, and I will be addressing the other crimes arguments, the obstruction and extortion jury instruction and sufficiency issues, and the double jeopardy issues. Hold on five minutes. I know. I did notice that you all blocked out the entire morning for us, so hopefully we have time. Well, that's the time you requested. The government was faced with a fundamental problem in prosecuting the appellants in this case. All of the government's direct evidence of the alleged crimes in which appellants personally participated consisted of the testimony, as Your Honors have noted, of admitted felons who shielded themselves from life sentence, prison sentences in most cases, for the very crimes that appellants were charged with personally committing by pointing the finger at appellants. Thus, the government's best evidence as to the crimes which appellants allegedly participated in personally was questionable on its face. Well, you're aware of our opinion in the field, correct? If Your Honor – I'm not sure Your Honor is going. I'm sorry. You're familiar with this Court's decision in McGill? Actually, I do have McGill with me, but I'm not clear. Well, I'm getting to the government's argument in this case that none of this is other crimes' evidence. Well, I think the problem is that the government is relying on what is asserted in a 22-page indictment, which covered charges against individuals who were not tried with appellants. And that should not dictate what is relevant to a criminal trial. That kind of reasoning puts the government in the position of just throwing whatever it can into the indicting papers and will just result in people fighting over what's going to be in the indictment. So, I guess what I'm trying to get you to focus on is to help me understand what role Rule 404B and Rule 403 have, and particularly after McGill, if any. Well, I think that 404 still applies with respect to the allegations that are specific to our clients, but it doesn't mean that everything that's in the indictment suddenly defines the scope of the criminal activity that can be presented at trial. Well, but... Go ahead. The charged offense is a conspiracy. And I think Judge Rogers is citing McGill because that case says that in the context of conspiracy, government can prove acts done in furtherance of the conspiracy to prove the conspiracy. And then, above and beyond that, this is a RICO conspiracy, so the government has to prove things like the existence of the enterprise and the existence of a pattern, and all of these acts are relevant to that. So, it seems pretty clear to me that there's a non-propensity purpose for all of that evidence, and your best argument is not a 404 one, but a 403. Well, I would agree to a certain extent with that, but I do believe that I don't think it was the intent of McGill to allow the government to bring in a series of criminal activity that occurred before appellants even joined the conspiracy. The problem I see, and that's at least what I was going to ask, is that neither your brief nor the government's brief really discusses what the evidence is in the light most favorable to the government as to the dates as to which of each of these appellants joined the conspiracy. I think the government says that with respect to Ayala, it's late 2000, or they say, I'm sorry, they say by 2008, or by late 2008, or something like that. But no one is really specific about dates here, and your argument is that these other crimes, acts, were prior to when your clients joined the conspiracy, but you don't present, how are we supposed to figure that out? With respect to Mr. Martinez Amaya, he became involved after Ponce was arrested, and these crimes were committed, a number of these crimes were committed by Ponce while he was involved. So it's clear in terms of that timeframe that he didn't join until after these horrific acts occurred, and they are the most inflammatory, I mean, the murders allegedly committed by, I'm not sure how you count this name. He came to the United States after those acts were committed, but the evidence viewed most favorably to the government is that he was already a leader of MS-13 in El Salvador, and was sent here to take over the leadership position. But, I mean, I understand what you're saying. The problem with this is, though, that MS-13 is a huge organization, and it operates in sort of different cells, so it's not, and that's part of the problem, what is the conspiracy? It's not clear that what happened in El Salvador is necessarily part of the same conspiracy that is involved in this particular case, and I think that it stretches the rule of relevancy too far to start pulling in activities that occurred before these individuals were even involved in the cliques that carried out these offenses. I mean, that's at least our theory. You could look at it both ways, but I think that it just becomes absurd to extend every single, you know, every single crime that MS-13 ever committed at any time, anywhere in the world, is now attributable to appellants, and you can present evidence of that. I agree with that, and I think you'd have a great case if the government were trying to put on evidence of crimes committed in prisons in California or years removed, but this one is pretty close in time and pretty close in space to the particular cliques we're talking about, and what's odd factually is what you said, which is this one individual was not yet here, but the evidence is of the enterprise and the pattern of racketeering in the clique that he eventually took over. Well, I would just disagree with you, Your Honor. I don't think that our clients should be held accountable for what happened before they even joined the clique or were even in the country. Joined the clique, but not before they joined the enterprise that was charged. That's, I mean, I think that's where I would make the demarcation point. I understand. Was there any sort of instruction given to the jury as to how they were to use and consider this evidence and as to which defendants the evidence was relevant to? I don't believe there was any sort of limiting instruction. Was any requested? Well, appellants repeatedly objected, and the court did not take it upon itself to offer some alternative. I understand that there were objections. I'm asking whether the defense sought any limiting instruction. I have not seen any specific limiting instruction that was requested. And I would just underscore how horrific this testimony was. I mean, the photographs are quite graphic of deceased persons and the injuries that were inflicted at the crime scene photographs are very graphic and bloody. And that, you know, you had eyewitness testimony from individuals who were attacked and wounded seriously. So for all of those reasons, we would argue that the – and I would also add that to the extent the government was trying to show how cliques operated and felt that this testimony was relevant to that, they had extensive testimony from Mr. Juan Diaz, I believe, the El Salvador national police officer. He testified for almost two days about how MS-13 operates and what they do. And we don't think that the government needed to bring any of this specific testimony in to demonstrate what was going on with the MS-13 gangs. And for all of those reasons, we would argue that the jury was inflamed by this testimony and prejudiced into finding the appellants guilty of the RICO, VICAR, and murder charges. Moving on to our next point, we attacked all of the predicate offenses on the RICO conviction. First, we argued that the jury instructions as to the predicate offense of extortion was improper because it left out the elements of a wrongful taking and that the object of the alleged extortion had to be something of value. And I think we clearly demonstrated that the testimony about collecting rents, which was the only testimony really about extortion, was fairly weak in this particular instance. First of all, there was testimony that indicated that rents were collected primarily from illegal activities. So there was an inference that there was a quid pro quo here, that the rents were being collected in order to protect the illegal activities from being interfered with by other gangs or that they were in concert with the illegal activities. There's no rule of law that permits extortion from an illegal business. Well, but I think that's not – the argument that I'm making is that there is possibly – there's an inference of a joint venture here, that the illegal operations were part of this gang activity and that they were helping each other, not that there was any real serious threat to the people who were paying rents. But the other aspect of this is that the individuals who provided testimony about the extortion said, well, yes, this is something that MS-13 does, but Eric Clicks weren't doing it. We weren't doing it when we were there. There was rent paid, but it was rent in the context of gang members basically paying dues when they showed up at a meeting. It wasn't in the context of any kind of extortion. And the testimony on that is pretty clear. So I think if you take all of that together, leaving out the wrongfulness element of it, really suggests that the juries could find that the appellants weren't engaged in any extortion activity. And for that reason, the error in the instruction was harmful. We also argued that the instruction on witness tampering was erroneous. Can I just ask before you move on? So the government represents in its brief there was evidence that appellants specifically funded their gang activities and maintained control of territory by extorting local businesses, prostitutes, drug dealers, and others in the community. Is that a misstatement? I think that does stretch the facts in this case. If you look at the specific testimony about what was going on. Gang members, including Machado, would collect rent from such individuals by threatening to injure or kill them if they failed to pay? I don't know. I mean, does the government cite any? I mean, there's a string cite. We can check the record cites. Because the cites that I'm seeing about this activity, the gang members are asked, so you collected rent, and they say, no, we didn't do it. Well, I mean, that was done, but we weren't doing it. And there's testimony by a number of them saying that we paid rent as dues when we went to a meeting, not necessarily as part of any extortion activity. So there's a lot of confusion about what exactly rents are. So, I mean, I don't believe that there was any specific testimony in which Machado said, I forced people to pay me rent. I don't think that exists in the record, but the government will have an opportunity to correct me if that's wrong. It's at page 31 of their brief. But I don't know what in the record it refers to. We'll check it. Okay. And then the other issue moving on to the jury instruction on witness tampering, we argued that that instruction was erroneous because of the omission of the materiality element or a charge to the jury that the conduct must have the natural and probable effect of interfering with the due administration of justice. And, again, in this context you have witnesses who all had some vested interests, were all impeached testifying about whether or not there was any conduct that might have interfered with their testimony. And had the jury been given this instruction, that would have been enough, we think, to tip the scale and possibly result in the jurors not convicting on that offense as well. And, finally, with respect to double jeopardy, as the Garner court found, it violates double jeopardy to convict Rico and Vicker for the same predicate offense. And to that extent, this court could apply Garner to say that the underlying murder conviction on the Rico charge cannot be relied on to support that. So you have all three predicate offenses to the Rico charge that are vulnerable to some degree. Or, alternatively, this court could take the position that the Vicker charge should be thrown out on double jeopardy grounds. Thank you. Counsel for the government? Yes, addressing first the other crimes argument. All of the challenged crimes here were admissible as direct proof of the charged conspiracy and were really not other crimes at all. What was the scope of this conspiracy? The conspiracy charge was a conspiracy beginning in the late 1990s and extending to the present. The other crimes that are complained of were crimes that were committed in 2008 and 2009, around the time period when these appellants joined or were members of the conspiracy. So if the conspiracy charge was from the late 1990s to the present, would a murder in 1999 by MS-13 in California be direct evidence of the conspiracy? I think it wouldn't be inadmissible under 404B. It would be evidence of the conspiracy of the enterprise. Whether or not it would be admissible under 403 is another question. At some point, a crime could be too attenuated to be probative, or the prejudicial value of the evidence may outweigh its probative value at a certain point. But that's not the problem that we have in this case. Well, my other question to you is, if that's the scope of the conspiracy in general, it's only what matters is when these defendants joined the conspiracy and when, if ever, they left the conspiracy, right? I don't think that's correct, Your Honor. Where a conspiracy is charged, the government is entitled to bring in evidence to prove the existence of the conspiracy, even if it was before or after appellants joined the conspiracy. To prove the conspiracy itself, the enterprise itself, the government would be entitled to bring in that evidence. Again, the 403 balancing might be affected, but as far as whether that evidence would be other crimes evidence, I don't think it would be other crimes evidence. Now, all... Shouldn't an instruction be given to guide the jury as to how they're supposed to use evidence like that? Well, a court is not required to give an instruction where the evidence isn't truly other crimes. We do require an on-the-record finding that it's more prejudicial. I'm sorry, that it's probative value outweighs its prejudicial effect, right? Yes, Your Honor. And was that finding ever made by the district court in this case? It wasn't stated on the record. I think that, you know, it's clear from the record, from the evidence and how it came in, that what, you know, how the district court ruled that it did, and I think this court has said that, you know, explicit findings are not necessarily required where it's obvious from the record, you know, the reason supporting the district court's ruling. Here, three of the predicate acts... Three of the acts that are challenged were actually overt acts charged in the indictment. So there really was no basis to challenge those crimes on 404B grounds. As to the other incidents that are challenged, they were all committed as part of the conspiracy and in furtherance of the conspiracy and by co-conspirators. So, again, all of these crimes were committed because of the gang and in furtherance of the gang. And is a limitation in your view about before and after limited to the clique or not even limited to the clique? In other words, I'm trying to understand if you're a district court judge and anything can come in, there's no 404B bar, how, what factors do you apply in a 403 balancing? Well, first of all, I wouldn't say that nothing that, you know, anything and everything can come in without offending 404B. I think that it has to, you know, if it's within the charge conspiracy, it comes in. I heard you. Any crime committed anywhere in the world by an MS-13 person between the late 1990s and the present? Again, I don't think that that's other crimes evidence. I think that it may be inadmissible because it lacks probative value or it's unduly prejudicial. But to answer Judge Rogers' question and Judge Katz's question, you're saying that that would not violate 404B for any MS-13 crime evidence from the 1990s to the present? If that was charged in the indictment, which it was, then I think the answer to that has to be no. It wouldn't, I mean, it wouldn't violate 404B. The indictment charged a broad conspiracy and, you know, for better or for worse, the government was entitled to bring in evidence to prove up the enterprise. Again, it doesn't mean that all crimes are admissible. I think it's the rule under which. So whenever the government charges a conspiracy involving MS-13 or La Cosa Nostra or any other sort of criminal enterprise, they can just say that the conspiracy involves the entire enterprise and then everything that proves that conspiracy is direct evidence under 404B. I think under 404B that sort of evidence would not, it wouldn't violate 404B. I'm not trying to suggest that it's admissible. I think that the admissibility in that instance turns on its probative value versus risk of prejudice. So I'm not at all suggesting that charging a broad conspiracy sweeps in everything that MS-13 could have possibly done. We're challenging you because it sounds like that's exactly what you're arguing. Your Honor, I don't mean to give that impression. What I'm trying to understand is we have these federal rules of evidence, but we also have the Supreme Court and old sheets making it very clear that the government gets to decide how it wants to prove its case. So if it wants to over-try it, that's the government's prerogative. The question is what's left for these rules? Now I understand your point. At least I understand your argument about 404B. I'm trying to understand if that's the position the government takes. It says, of course, there's always 404, 403. I wonder what a district court judge does with that. Well, I don't know. What are the limits? And I haven't seen any cases helping me with the limits, except where a judge goes and just through a sponte says, I think that's too much. Sure. I don't know where those limits are. I think it's dependent on the case. It's dependent on the evidence. But we don't confront that in this case. So in this case, that's what I'm trying to understand. The evidence, is it all limited to the two clicks? Yes, Your Honor. And the only issue now before us is the before and after question. That is the argument that they raised on appeal. I think there was, to Judge Wilkins' question, to Ms. Penbroke, there was evidence that Ayala had joined the conspiracy by the age of 15, which would have been in 2006 or 2007. We know he was 17 at the time he committed the murders charged in this case in 2008. So he certainly was a member of the conspiracy during these 2008 and 2009 crimes. Martina Zemaya was brought up in December 2008 to lead the Normandy click after Gil Bernardez had committed these crimes which were being challenged. So Martina Zemaya's very presence and leadership of this click is all due to these other, supposed other crimes that they challenged on appeal. With respect to Machado Arraso, the evidence, the earliest evidence that I could find was that he was a member of the click in early 2009. But, again, whether he was a member at the time of the commission of these other offenses is not a reason to exclude them. These other offenses were admissible because they proved the existence of the enterprise itself. And, again, the probative value of the crime theory. And they could tend to show that the murders committed by the defendants were part of a pattern, a legal pattern, right, weren't one-off. Or, even more precisely, that the defendants agreed to commit patterns of murder as opposed to just isolated acts. Certainly. And the evidence that's challenged here, these are all crimes that are committed against rival gang members, which is, you know, the pattern of racketeering that we established at trial. Or rival gang members or members of the gang who had violated rules. Exactly. Exactly. So these were not offenses that were unrelated in any way to the conspiracy. They were, in fact, exactly what the conspiracy was intended to do. The probative value here was certainly not outweighed by any unfair prejudice. And, you know, the crimes here were not particularly prejudicial, given the evidence of the very violent acts in which appellants themselves had engaged. With respect to the extortion instruction, any inference here that there was a joint venture of illegal operations is simply not supported by the record. You don't defend it on the merits, right? You don't defend that instruction to the extent it omitted the element of wrongfulness. To the extent it omitted the wrongfulness element, we think it was error. Right. But we think that appellants can establish plain error affecting substantial rights because of the very compelling evidence that what, in fact, was done here was extortion under the law. Almost every cooperator testified about their CLIPS efforts to collect rent from illegal businesses and others in the community. Appellants suggested that this testimony was vague or that there really wasn't any testimony that these particular CLIPS collected rent, but that's simply not true. Avila Melendez himself testified that Machado Arazo collected rent. And Machado Arazo can be heard on a recorded phone call talking about the collection of rent. Fuentes, Moyeno, Silva, Sarabia, Solorzano all testified about money extorted from others through threats to kill or injure. And is that your evidence of that is what I was summarizing from page 31 of your brief? Yes, Your Honor. Okay. From each of their testimonies. Right. With respect to the – I can address the obstruction instruction if Your Honor's wish. I've exceeded my time. And the double jeopardy issue if the Court has questions. Is it on your brief? Yes. Thank you, Your Honor. Thank you. Rebuttal? If I can just briefly address a few points the government raised. First of all, with respect to the participation of appellants in the CLIPS that committed the crimes at issue, Elia was a member of a different CLIPS. He was not a member of the CLIPS that was involved in the late 2008 offenses. The government admits Machado didn't join until 2009. And while the government would like to allege that my client, Mr. Martinez Amaya's, participation in the CLIPS in this area was due to these other offenses, there is no real clear evidence of that either. The government also wants to allege that the relevant time period is from 1990 until the present. But RICO must be limited to incidents that occurred at least within a 10-year period. So we would argue that there is some statutory basis for limiting the conduct that you're talking about to a 10-year period. The Court has asked about whether or not there's any case law to support limiting the time period that's covered by what the government can allege in a conspiracy. We cited in our brief the Dorsey case, which was a Florida case that uses a statute that tracks the RICO statute and talks about how the time period there has to be a cutoff as to how far you can go. And McGill actually does strike certain evidence of other acts as being too far outside the scope of what was going on to allow it to be admitted. The predicate murders here, if my notes are correct, occurred between November 2008 and March 2010. And the other crimes, reputative other crimes about which you're complaining, occurred from July 2008 to December 2009. It seems like it's a pretty close fit, at least temporarily. So the hypothetical is about going back a decade or two or not this case. I would have to double-check the late 2008 date, but that may be with respect to Defendant Elia's conduct. And the other crimes that we're focusing on are crimes that were committed by a different clique. So there's a disconnect there in the time frame. The crimes that were committed by the clique of which Mr. Machado and Mr. Martin Izumaya were associated well predated the predicate murders that were alleged in the indictment against them. On the clique point, there are possible distinctions between the two cliques at issue. I get that. But on the other hand, all of this involves the charge defenses and the reputative other acts all involve MS-13 in the greater Washington, D.C. area. So again, it seems like there's a fairly precise geographic fit, and the hypotheticals about California and El Salvador are not this case. Well, having lived in D.C. for a long time, to me, Reston is the other side of the world. I mean, I never get out there. It's a ways away. So I don't know if I would agree with that. But in any event, turning to the government's arguments about the ‑‑ I'm sorry. Oh, the court has asked about whether this evidence was needed in order to establish a pattern. We would argue that, again, the testimony of Juan Diaz, which went on for two days about what MS-13 does and how it operates, was more than sufficient to establish any kind of pattern the government needed. And to get into these specific crimes was really done only for the purpose to inflame and prejudice the jury. And with respect to the issue of rent, the government has asserted that Machado said he collected rent. Again, though, I believe that if you look at that testimony, and this is the point I was trying to make, Machado doesn't explain what collecting rent means. He doesn't say, I extorted people by collecting rent. And I could be wrong about that. But my recollection is the testimony about the phone calls in which rents were referenced didn't articulate what we mean by rent. And remember now, we're talking about a term of art that's being used by the gang in Spanish that's being translated. I mean, I don't know when he's saying rent, maybe he's talking about dues. Maybe he wasn't referring to anything that involved any kinds of threats. We have no idea. And unless the court has other questions. Thank you. All right, we'll turn to Issue 3. May it please the Court, Mark Eisenstein on behalf of You can raise the podium if it would be more comfortable. There's a button on the side, right side. Thank you, Your Honor. May it please the Court, Mark Eisenstein on behalf of Appellant Yester Ayala addressing the issue of duress. We ask this Court to reverse Mr. Ayala's conviction and find that the trial court erred in precluding Mr. Ayala from presenting evidence on the issue of duress and refusing to provide the requested jury instruction. Mr. Ayala's sole defense of trial was duress, but evidence and argument was never meaningfully made to the jury. The circumstances of the case and the proffers made by trial counsel were sufficient for which a reasonable juror could find for Mr. Ayala on the issue of duress and the court erred in precluding both the evidence and the instruction. Any hints of duress argument trial counsel may have been able to get on the record were of no value to Mr. Ayala without a corresponding jury instruction. The trial court precluded Mr. Ayala from introducing affirmative evidence on the issue of duress and while the jury may have been thinking from a lay person's perspective about the issue of duress, they were unable to act or make any meaningful use of it to the benefit of Mr. Ayala without the requested instruction. The record demonstrated that Mr. Ayala acted under the threat of imminent harm and he lacked a reasonable alternative to committing the charged offenses. There's no need for the evidence used to support the duress argument to be overwhelming. Weak support is sufficient to allow the defendant to introduce evidence and obtain the requested instruction. Mr. Ayala's imminent threat of death was serious bodily injury. Mr. Ayala was required to strictly abide by MS-13 rules and follow all instructions. The penalty for not doing so was death. There was testimony from MS-13 members about how the rules were enforced, what the rules were, and numerous examples of what happens for violating a gang rule. What about our case law, in effect, saying that you can't voluntarily place yourself in a precarious circumstance and then claim duress when that circumstance comes to be, essentially? I don't believe the government's taking that position, but with respect to the case law, I think you have to look at the facts and circumstances of the charged offense and whether it's imminent threat of harm and no reasonable alternative. I think that may cut against one or two of those factors, but I don't view the case law as a bar of anybody who joins a violent street gang that they are precluded from introducing the issue of duress. No, but you're focusing the duress analysis very late in time, right? He's in the gang, the hit's been ordered on someone, he learns about the hit, and you say, well, at that point he has no choice. Your Honor, I believe. But there's also testimony that he's been in the gang for two years. He chooses to join the gang and he's in for two years before the murders happen, which raises both Judge Wilkins' point about voluntarily placing yourself into a situation that becomes duressful, if that's a word, and the prong two of our case law, which says if you have opportunities to go to the police or seek help or whatever, that forecloses the defense. In respect to the first issue, I believe, this is not a case where Mr. Ayala simply knew of the green light and he saw Mr. Zambrano Zelaya walking down the street and he decided, I have to act, I'm going to act. If you look at the facts and circumstances of the offense, there was a number of MS-13 members in an apartment building. Another member, who I believe his testimony was higher up than Mr. Ayala, said, we found Mr. Zambrano Zelaya, we're going to execute the green light. And Mr. Silva, that individual, assigned roles. He said, you, Mr. Ayala, you're responsible for this part. You, Mr. Rudy Martinez, you're responsible for this part. We're going to go downstairs and act. So I think under those circumstances, Mr. Ayala, when he was given the instruction, you need to go downstairs and stand. And I'm willing to assume for the sake of argument that at that point in time, he might have a defense, but it's the wrong point in time because it ignores everything your client had done in the prior two years to get himself in that situation. So I believe you need to focus on the two charged conducts or the two murders. So I believe the relevant focus, respectfully, is when the crimes are happening, whether Mr. Ayala at that point was under imminent threat of harm. Even if his decision to join MS-13 a couple years later was entirely voluntary. Your Honor, I think you need to look at the circumstances, at all the facts and circumstances. I think Mr. Ayala presents a unique case with respect to whether his joining the gang was voluntary. There was testimony or proper testimony that Mr. Ayala was young. No, I understand. And we can talk about that separately. But the theory you just articulated would give a defense to someone, even to someone who voluntarily joins the gang and knows, I'm going into this gang that has these rules, and I opt into that, and then I find myself in a tough position a couple years later. I think there's a distinguishing fact, and there's a question in the record, through proper testimony, about whether Mr. Ayala voluntarily joined the gang. I understand, but put aside that. I'm testing your claim that in assessing whether or not the murders were committed under duress, the relevant time frame is right at the end when he learns of the green light, and you say at that point has no choice. Yes. It seems like you're starting the story much too late. But I believe given the focus is on the imminency, I think that's where the focus needs to be. Was the evidence that that was the first that he learned of this particular green light? No, Your Honor. I believe there's testimony that he previously learned of the green light, and he knew about the green light, but it was on that evening when he was instructed to act. We think there's a distinction between merely knowing of the green light and the gang rules say you need to carry out the green light and being directed and ordered minutes before the act occurs. But how do you then respond to, I guess, the government's argument that you can't, if you know about the green light and you know that you're expected to act immediately if you see this person or else you will be killed, then you can't, your obligation if you know that that's the way that it works, your obligation to withdraw from this is earlier and not when, oh, all of a sudden you come upon the person who's been in green light. I guess that gets to the question, the second element, about whether Mr. Ayala or the individual has a reasonable alternative. From Mr. Ayala's perspective, he had no reasonable alternative. He believed he was in the gang and he needed to follow orders, otherwise he'd be killed. He needed to look no further than the circumstances of Mr. Mimbrano's Elias killing. He was an MS-13 member in El Salvador. He moved to the U.S. and he tried to disassociate himself with the gang. He tried to remove his tattoos. He tried to stop hanging out with gang members, and simply for doing so he was subject to death. A green light was issued and he was subject to death simply for doing that. So from Mr. Ayala's perspective, he believed he had no reasonable legal alternative. He didn't believe he could go to the police. That wasn't a reasonable outcome because he knew exactly what would happen. The gang rules mandated that he would be killed for failing to follow through an order. He'd be killed for going to the police. And he, from his perspective, had no reasonable alternative. Can I ask a different question, which is all of the thrust of your argument in your briefing here is a claim of duress to a murder. I thought it was black letter law that there is no duress defense to murder. Your Honor, I believe the issue of duress can go to the elements and whether the government can prove the elements. There's a case from the Central District of Florida, United States v. Slocum, which is not in the briefing schedule but I happened to look at it in preparing for today, which the issue came up about whether murder is a defense to murder and interrogateering. You should give us the site. Oh, I'll do that. The site to that. 486-S2-1104. And I believe that case said that the issue of duress can negate or prevent the government from proving malice. Well, sure, but that's not what you're trying to do here. You're not in the mens rea. Mens rea of the crime is premeditation, voluntary action. I assume it's something like that. You're using duress as an affirmative defense to say, yes, it was premeditated and knowing and everything else, but my defendant should go off scot-free because he was forced to do it. I believe it goes directly specifically to the issue of malice, about whether the government's evidence can prove malice. And if not, then I don't think the murder conviction. So below it was presented that way, that essentially we want this defense so that we can try to try this down to a manslaughter? I don't believe it was ever. It was clear from the record what trial counsel's argument was, but I don't think it was ever fleshed out. I mean, that's certainly not how you presented it here, where your claimed error is failure to get instructions on the affirmative defense, which has these two elements that we've been talking about. In terms of, I don't understand your question. I apologize. The error you're claiming on appeal is failure to give you the affirmative defense of duress, not that you were somehow prevented from litigating, from defending against the government's proof of whatever mens rea requirement attached to the murder convictions. But I believe that's part of the argument, that the trial court also declined to allow Mr. Ayala to prevent witnesses from five different people about the issue of duress, and proffers were made and the trial court declined to allow that. And the government cites the Noe case, which I think has distinguishable facts, but even in that case where the individual went to California for a month and was away from the person they were claiming duress, they were able to present the evidence, and then after the evidence was presented, the trial court found that the instruction would not be given. We don't believe that the predicate murder offense is under the D.C. Code, and what's the mens rea element? It's malice. I believe the thing for the, yes, the relevant mens rea is malice. And you're saying that this evidence that you proffered would tend to negate malice? Even if it were not an affirmative defense, it would tend to negate the malice element of the offense? Yes, to prevent the government from proving that element. And we don't believe that allowing this instruction would open the floodgates and allow every defendant who's a member of MS-13 or a member of any gang to claim duress. Here, Mr. Ayala's youth, his low IQ, and his susceptibility to the influence of the gang is a unique circumstance, which I don't think would be repeated in many circumstances, and also the fact that Mr. Ayala didn't just know that Greenlight, he was ordered to carry out. And I believe I'm well over my time, so unless the court has any questions. Thank you. Counsel for the government? The district court did not abuse its discretion or did not err in denying the duress instruction here. Mr. Ayala failed to proffer any evidence whatsoever that he acted under an unlawful threat of imminent death or serious bodily injury. And most of the evidence showed veiled threats of future unspecified harm, which courts have held as insufficient. He's never proffered that a specific threat was actually made to him. The only specific threats he proffered were made to his mother and sister after he was arrested. And he failed to show that he had no reasonable legal alternative to committing the crimes. He was a member of the gang for two years. He had every opportunity to seek assistance from law enforcement or from others. Isn't it a little rich for the government to argue that there was no real threat to him when the whole theory of your case and the whole theory and all your evidence about how MS-13 works is that, you know, if you don't follow the gang rules, you get killed? Your Honor, I'm not suggesting that there wasn't pressure on gang members to commit crimes, but to present duress as a legal defense, Ayala had to satisfy the standard, which was showing an imminent threat, specific threat of harm to himself. So while he may have been pressured like others to commit crimes, as a legal matter,  this court has found in even more pressing circumstances that duress hasn't been met. In Jenrette, there was a two-day period of time in which the defendant could have acted. So the fact that he may have felt pressured by the norms of the gang to commit crimes simply is not enough legally to warrant a duress instruction. Even accepting Judge Wilkins' point about the whole theory of your case, does he still lose on no reasonable alternative? Yes, he still loses on no reasonable alternative because, first of all, he had plenty of time to seek assistance. And second of all, even if, you know, even if we assume that in the moment, you know, he was required to execute the green light against the murder victim, you know, the evidence was that a green light wouldn't issue against a gang member without investigation and deliberation. So there was no, you know, the suggestion that he was under the threat of imminent death in that moment simply is not borne out by the evidence in the case. Green lights here were issued by, you know, top leaders in El Salvador, trickled down after some amount of deliberation. Any threat that might have, he might have felt in his life would have only come after the fact. You know, in the circumstances of this case where he was an active leader of a clique and in fact, you know, had threatened others to commit crimes, there simply wasn't evidence that he himself was some helpless victim of the gang and acted under duress to commit the offenses here. In any event, he was able to present more or less his duress defense through cross-examination of every single cooperating witness where he elicited that, you know, that the penalty was death for failure to comply with gang rules. He argued extensively in closing arguments that he acted under duress. And so the jury was fully aware of his theory of the case. How do you respond to your friend's argument that even if he weren't entitled to the affirmative defense, the evidence was improperly excluded because it tended to negate the malice element that you had to prove? Well, I don't think that he was prevented from negating that. In fact, he quite successfully presented that theory that he lacked malice, that he lacked the specific intent to commit these crimes through his cross-examination of the cooperating witnesses. So I think that the court's rulings here didn't prevent him from putting on evidence negating the intent required for these crimes. The jury was well aware that his theory was that he did not commit these crimes because he wanted to, but rather because the gang told him to. Did the court give a second-degree murder instruction or manslaughter instruction for the murder of a member in the Zelaya? I don't recall if the court gave a second-degree murder instruction for that offense. I know the court gave that instruction for the Sanchez murder. Because he was convicted of second-degree. Exactly. I think they all did. I mean, on the verdict form, each of them has the choice, first or second. Okay. Yeah, I don't have a specific recollection at this time. But the fact that they did find him guilty. But manslaughter, absence of malice, would require a finding of guilt on manslaughter, as opposed to second-degree murder. I mean, malice is an element of second-degree murder. That's true. But in finding him guilty of the lesser-included offense, the jury necessarily found that he did not have the intent to commit the first-degree murder charge. So, I mean, I think if we're going to read anything from the jury's findings, it's that they bought into his theory that he did not act with premeditation, deliberation, and specific intent. So, you know. But the jury was never told or given the option that they could find that this pressure that he was under could be sufficient, or it's up to them to determine whether that raises a reasonable doubt as to whether the element of malice is present. And if so, then they have the option of voluntary manslaughter. No, the jury was not told that. I mean, the jury was instructed that they had to find each element of the offense, including the mens rea element. And, you know, in this case, there simply wasn't support in the record for the direct instruction. There wasn't support in the record for – and I don't believe that a manslaughter instruction was requested either. But, again, there was simply no support in the record here that Ayala acted out of coercion in committing these crimes. That was my next question, because, I mean, you could ask for a manslaughter instruction without getting a duress instruction, right? Right. I mean, yeah, ask for manslaughter, lesser included. Yes, Your Honor. But you don't believe that they did, right? I don't believe that they did. I was going to ask you, so your reading of the record here is that the proffer of the expert was simply – not simply, but only in connection with the affirmative defense. That's how it was presented by Ayala. That's how it was proffered by Ayala, that it went to his duress defense. But was this argument ever made to the district court about negating an element? No, Your Honor. I believe that it was all in the context of presenting duress as a defense. And is that something that presented here as oral argument for the first time? I believe so, Your Honor. All right. Can I just ask one more question? I'm curious why the government didn't argue that duress is not a defense to murder. Do you agree with that proposition? Your Honor, I'll be quite honest. I did not think of it. In briefing this, I looked at the court's cases on duress, and it didn't occur to me. I'm happy to brief it for the court if the court wishes. If there are no further questions, we'll rest on our break. Thank you. All right. A moment of silence. With respect to the question about whether this argument was ever meaningfully made to the jury, I guess whether there's harmless error, the way I think about this case is allowing somebody or allowing trial counsel to argue duress through cross-examination and arguing it through closing without the instruction is similar to finding, or in a civil case, allowing a defendant to argue contributory negligence to the jury without a corresponding instruction. The jury would not know what to do. They wouldn't know, like Your Honor, Judge Wilkins pointed out, how to use this evidence. Does it negate an element? Should we find on a lesser-included offense? And the fact that one of the convictions was ultimately secondary murder, I don't believe that is proof that this evidence was immediately made and effectively made to the jury. Do you dispute the government's representation that it was never submitted below, that you were trying to negate an element, and that you didn't request a lesser-included instruction for manslaughter? My review of the record did not show that there was a request for a manslaughter, lesser-included offense. And I think the point about the green light, I think the distinguishing fact here is that Mr. Ayala just didn't act on the green light on his own. He was instructed to act on the green light minutes before the murder occurred, and there was testimony at trial that the failure to follow through, an individual who didn't follow through on an instruction to carry out a green light, was subject to death and the death of their family. So under those circumstances, Mr. Ayala had no choice but to act. And our understanding is that the reasonableness or the factor or the relevant standard with respect to reasonableness is whether a person of reasonable firmness in Mr. Ayala's situation would believe he or she had no reasonable alternative but to act. And I believe under these circumstances, Mr. Ayala's thinking or Mr. Ayala's position was reasonable and should have been a fact question that should have went to the jury. So was that the nature of the expert testimony that he offered? I believe that Dr. Duclos was the proper expert, and one of the things he was going to testify to is Mr. Ayala's youth, his low IQ, and his susceptibility to gang influence. So I think it would go to the reasonableness of whether he was reasonably in his belief that he had no other alternative. And I believe that those factors, I think, would have bore fruit for the same reason that the trial court in sentencing Mr. Ayala considered his youth and considered all these factors in fashioning an appropriate sentence other than life. So the expert would have testified that he was young and that youth make unmeasured decisions and lack mature judgment. Yes, Your Honor, I believe he would have testified. That's what I thought that proper was, not the next step, that even though having been in this gang for a number of years, upon being confronted with the Green Light situation, he simply lacked the mental capacity to do anything but go along and would not have understood that when the detective suggested he had an alternative, he was simply too young to appreciate that such an alternative could exist. I mean, I'm trying to understand this. When I read the district court's opinion on labor, you know, he may be young, but he's a sophisticated dude to the extent he is. Now, the expert was going to talk about he has an IQ of 77. Yes, Your Honor. I don't think the position is that he lacked the mental capacity to understand that he had a choice. I think it goes to whether it was reasonable or whether there's a reasonable alternative somebody in Mr. Ayala's shoes believed that he had a reasonable alternative but to act. And the expert was simply going to talk about his youth. Is that correct? Correct. I believe he's talking about his youth, and I believe he's talking about probably the same thing that we're in the progeny of cases from Roper up to Miller about why youthful offenders are different. So for the same reason, the development of the brain and decision-making process, I believe that also goes to whether there's an imminent threat of harm and about whether Mr. Ayala lacked a reasonable alternative. Thank you. Thank you. All right. We'll hear Issue 4. If it pleases the Court, Thomas Corcoran. I'm here on behalf of Machado Arraso along with the fabulous Jera West, and I'll be making two arguments on behalf of Machado Arraso and Martina Amaya. The first is the extra 10-year sentence pursuant to 924C3 for carrying a firearm during a crime of violence. Pursuant to Supreme Court precedent, the correct approach is the catechorical approach, and that is here whether ordinary people, quote, unquote, ordinary people will think a crime involves violent physical force based upon its statutory definition, not what the guy did. If a prior conviction is based on a statute that in its least violent application does not involve violent physical force, it does not qualify as a prior conviction involving violent physical force. Maryland first-degree murder, which is the murder here, can be done by poison or various other things, other kinds of premeditated murder, such as trickery or withholding life-saving medication or sustenance. The weight of authority now supports Machado and Amaya's position here. USC Middleton, a Fourth Circuit case decided just six weeks ago, ruled that Torres Miguel, the case on which we have chiefly relied and on which the government, I've argued, had been superseded by Irby, was the controlling case. Under Torres Miguel, a crime can result in death or serious injury without involving the use of physical force. Accordingly, Maryland first-degree murder, which can be done by nonviolent means, does not involve violent physical force. The government relies on this court's January decision in U.S. United States v. Venbo. I mean, this is the supplementary authority you received, I think, yesterday maybe. In addition to being non-presidential, the decision is unpersuasive because it misinterprets Castleman. Castleman addressed the common law concept of force, which encompassed even the slightest offense of touching. That is not 924C, violent physical force. Finally on this issue, last Friday, April 6th, the Supreme Court granted certiorari in the case of Stokelyne v. United States, 11th Circuit case. The issue is whether an offense which has been interpreted by state appellate courts to require only slight force is categorically a violent felony under the Armed Career Criminal Act. That is, they granted certiorari in this case. So it appears that they're not going to change their views about categorical force, excuse me. The elements of plain error pursuant to this court's decision in Hunt are met. Given Middleton's adoption of Taurus-McGill, there's now plain error. Under Henderson, it is sufficient that the error is plain at the time of direct review. And quite clearly, it affects the appellate's substantial rights. Ten years in prison is a substantial thing. Also, the failure to argue below is not to yield a tactical advantage. Samuel Johnson was struck down in the ACPA. Residual applause was decided three days after Machado and Amaya were sentenced. And other decisions such as Middleton have made the present argument more convincing. And now I'd like to turn to cruel and unusual punishment, which I realize is a bit of not a likely winner, but in any event. First, in Miller in 2012, the court relied on, quote, evolving standards of decency that mark the progress of maturing society in ruling that life without parole for juveniles was a cruel and unusual punishment. Life without a significant chance for parole is now not allowed in the European Union after the 2013 Venture v. United Kingdom decision. The question here for my clients is how I get past the Harmelin 1991 concurrence, it's only a three-judge concurrence, which the court in Graham in 2010 ruled was a controlling decision. If the First Circuit in Rivera, the case I brought to your attention on Friday, I think, could not get past Harmelin, how can this court? The initial factor in Harmelin, the factor to be considered before comparisons to other sentences, is, quote, whether the threshold comparison leads to an inference of gross disproportionality. Well, what makes a sentence grossly disproportional? Quote, the evolving standards that mark the progress of a maturing society, as Judge Kennedy wrote. If no civilized democratic state permitted life without parole, that would make life without parole seem grossly disproportional. Venture is arguably such a big change in Harmelin, decided in 1991, was decided 18 years ago, that is, a generation ago. Finally asked about Salvador, you've already heard this, MS-13 is more or less in charge there, and refusing to join the gang there means death. This is the same sort of situation that motivated the court in Miller to rule that life sentences for juveniles was cruel and unusual punishment. As the court wrote in Miller, children are more vulnerable and have limited control over their environment and cannot extricate themselves from crime-producing settings. This is precisely the case for Majano and Arazo here, in El Salvador, and out here, you must join MS-13 or very likely get killed. Are there no questions? Thank you. Thank you. We have from the government. Feral and first-degree murder qualifies as a crime of violence under both the force clause and the residual clause of 924C. Murder qualifies under the force clause because it satisfies the Johnson definition of violent force. It requires force capable of causing physical pain or injury to another. Appellant's suggestion that Castleman is inapplicable is simply not supported. This court, in rhetoric, looked to the reasoning of Castleman in considering whether armed robbery was a violent felony and relied on Castleman's distinction between direct and indirect uses of force. That distinction requires the rejection of appellant's contention that murder by poison doesn't require violent force. The statute requires physical force, and the Supreme Court distinguished physical from intellectual and moral, so what about a murder convicted through one of those means? Through intellectual force? Yeah, someone induces a victim to step on a ledge by saying that it's secure or whatever, and the person falls to his death. I wouldn't categorize that as a lack of physical force. I think that that goes to the distinction that Castleman made between direct and indirect uses of force. I mean, the case where it would be the same with the use of poison or exposing a baby to the element. Yeah, I mean, this is in Johnson. They say some cases involve physical force and other cases involve intellectual or emotional force, and I hear what you're saying, but it just seems to be fighting that dichotomy which the court gave us. I think Johnson also specifically recognized murder as a quintessential case or crime of violence. So although force may be applied in different ways, I think it's incorrect to conclude that violent force or physical force is not used. It's simply, again, this Castleman distinction between how force is applied rather than the nature of the force itself. I'm not hung up on violent force versus mere touching. I'm more worried about the physical versus intellectual part of Johnson. Again, Your Honor, I really think, though, that even an intellectual, I don't see how it's possible to commit a murder through purely intellectual force. I would have thought that that involves what we've described as excessive legal imagination, except Justice Scalia gave it to us. Well, I don't think that takes it out of the realm of excessive legal imagination, but it certainly, I think, is not what one would consider typically to be a commission of murder. When we look to outside the realm of those kind of hypothetical, imaginative hypotheticals, as this court cautioned in rhetoric, murder, pure and simple, first-degree murder, pure and simple, is, again, the quintessential crime of violence. Turning to the... Can I ask this question? Let's suppose the defendant knows that someone has a severe nut allergy, and that person says, you know, does this cake have any nuts in it? And the defendant knows that it does, but says, no, it doesn't. And the victim eats some of the cake and dies. And couldn't that person be convicted of first-degree murder under the Maryland statute? I believe so, Your Honor. It would be an intentional killing. I suppose in that instance the nuts would be akin to poison to the person. So your argument is that that was a use of physical force? Yes, it is a use of physical force. Again, as the court explained in Castleman, it's the application of the, you know, of the killing agent to the person, even if it's by indirect means, that is the use of force. So poison is a forceful element. The case didn't bake the cake. It was baked by somebody else from the office. But the defendant knew what was in the cake and let things happen the way that they happened because they wanted that person dead? I think if the defendant is the person who knows and knowingly and intentionally puts that person in the path of death, then, yes, that person would be liable for committing a violent felony. You know, the person who baked the cake, you know, if there's no showing of, you know, intention there or knowledge. The defendant is the one that I'm talking about who didn't bake the cake, who just, you know, answered the question falsely, didn't bring the cake, somebody else brought the cake, but the defendant answered the question falsely. So where would the defendant's use of physical force be? Well, it's intentionally placing this person in the path of a force, which would be the nuts, the poison. And that's exactly what happened to the cake. You didn't tell him to eat the cake. I'm sorry. The victim wanted the cake. The victim loves cake. I love cake, too. But if somebody knows I have a nut allergy and it's severe enough to kill me and doesn't know the cake has nuts and doesn't stop me from eating it, I would call that an intentional killing by use of force. And the force, again, is an indirect application of force, but it doesn't mean that it wasn't violent force. It's not, for example, as Councilman explained, it's not, you know, when somebody kills with a gun, one could argue that the pulling of the trigger is, you know, not the application of force, but I don't think anyone would argue that shooting somebody with a gun is not a use of violent force. I think it's the same. It's not how the force is applied. It's what is the nature of the force used, and a poison is a violent force that leads to a killing. For all of those reasons, we contend that Councilman is applicable and that first-degree premeditated murder is clearly a crime of violence. I can talk about the Eighth Amendment issue, or if there are no questions, I'll rest on our brief. I would ask this Court to affirm the judgment of the District Court. Well, may it please the Court, looking at the specific facts of rhetoric, the Court refused to accept that armed robbery by poison was a sufficiently possible way of killing somebody that it escaped the categorical approach there. But murder by poison is a lot more probable than armed robbery by poison. And finally, I just want to emphasize one point. The issue here is whether, quote, ordinary people will think a crime involves violent physical force. I don't think ordinary people would think that first-degree murder involves violent physical force. By poison involves violent physical force or under the hypothetical by Judge Wilkins. All right. Is there anything else? Thank you. Thank you, Your Honor. All right. Well, we will take the case under advisement. I want to express the Court's appreciation to the appointed counsel. Very helpful to the Court in argument and in brief. Thank you.
judges: Rogers, Wilkins, Katsas